Minnie L. DISMORE, Administratrix of the Estate of Francis Elmo Dismore, Deceased, Plaintiff-Appellant,

v.

AETNA CASUALTY AND SURETY COMPANY, a Corporation, Defendant-Appellee.

No. 14480.

United States Court of Appeals Seventh Circuit.

Nov. 24, 1964.

Floyd F. Cook, Daniel J. Harrigan, Cook, Bayliff, Mahoney & Martin, Kokomo, Ind., for appellant.

R. Stanley Lawton, James V. Donadio, Jim A. O'Neal, Indianapolis, Ind., Ice, Miller, Donadio & Ryan, Indianapolis, Ind., of counsel, for appellee.

Before HASTINGS, Chief Judge, and KNOCH and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

Robert Meek Plumbing and Heating, Inc. (Meek, Inc.), an Indiana corporation, contracted with Purdue University to install plumbing and heating systems in a new building. Defendant, Aetna Casualty and Surety Company (Aetna) executed a surety bond with Purdue as the obligee and Meek, Inc. as the bonded contractor, conditioned upon a satisfactory performance of the contract. Meek, Inc., when its contract with Purdue was partially performed, became involved in financial difficulties, and an arrangement was made between Aetna and Meek, Inc. by which the former agreed to furnish the money so that the latter might continue performance of its contract.

On September 2, 1960, plaintiff's decedent, Francis Elmo Dismore, an employee of Meek, Inc., while at work on the Purdue job was killed when using an electric hammer, furnished by Meek, Inc., alleged to be defective and unsafe for use. This action was brought against Aetna on the theory that it was liable for the negligence of Meek, Inc.

The material allegations of plaintiff's complaint follow. She alleges that decedent was an employee of Meek, Inc.; that Aetna entered into a performance bond with Meek, Inc. and Purdue, agreeing to complete the contract in the event of any default by Meek, Inc.; that Meek, Inc. became involved in financial difficulties, and that Aetna promised to and did provide financial assistance to Meek, Inc. "for the sole purpose of assisting in the performance of the work in question." The complaint sets forth the manner in which Aetna agreed to pay the employees of Meek, Inc., which in brief

was that the latter would prepare weekly checks for its supplies and payroll which, after approval by Aetna, would be paid by a bank from funds supplied by Aetna. She alleges that one Harold Miller, a representative of Aetna, made frequent trips to the job site "for the purpose of determining whether the work was progressing in a way satisfactory to the obligee (Purdue) under the performance bond and for the purpose of physically observing the general progress of the work to determine whether or not the expenditures submitted for payment appeared reasonable under the circumstances." She alleges, "Aetna Casualty and Surety Company became the principal and Robert Meek Plumbing and Heating Co., Inc. became the agent and controlled contractor of the defendant in the performance of the heating and ventilating work on the Purdue University job; and at all times said Robert Meek Plumbing and Heating Company, Inc., a corporation, continued the work on said project in the course and scope of said agency and controlled contractor relationship with defendant." She further alleges that Meek, Inc. as the "agent or controlled contractor" committed various acts of negligence in connection with the furnishing and use of the defective hammer which was the proximate cause of decedent's death and for which Aetna was liable.

In response to the complaint, Aetna denied the material allegations and moved to dismiss and for summary judgment for failure to state a claim upon which relief could be granted and for lack of jurisdiction over the subject matter, for the reason that plaintiff's remedy, if any, was for workman's compensation benefits, not for damages. Defendant in support of its motion submitted plaintiff's interrogatories to Aetna, its answers thereto, and an affidavit by its claim adjuster, Harold Miller. In the affidavit Miller stated that he was the representative of Aetna, with the duty of advancing funds to assist Meek, Inc. in performing its contract with Purdue; that he visited the job site at frequent intervals to ascertain whether the number of men on the job was consistent with the payroll money being advanced by Aetna, and that he conferred with officials of Purdue to determine whether it was satisfied with the progress being made by Meek, Inc. Miller specifically denied that he had ever seen the hammer in question or that he supervised, controlled or instructed in any fashion any employee of Meek, Inc. relative to the work or the handling and repair of tools. He stated that all matters pertaining to the manner and method of performing the work were decided by Meek; that he had no right to hire or fire employees of Meek and did not attempt to do so, and that his sole function was to insure "that money spent by his employer was utilized to pay for materials, supplies, tools or labor used on the job in question."

In opposition to the motion for summary judgment, plaintiff submitted the deposition of Robert Watson Meek, president of Meek, Inc., taken in a case in the United States District Court for the Western District of Pennsylvania, entitled *"Minnie L. Dismore, individually, and as Administratrix of Francis Elmo Dismore, deceased, plaintiff v. Syntron Company, Inc., defendant,"* the manufacturer of the alleged defective hammer.[1] Plaintiff also tendered six letters or copies thereof—four signed by Miller, one to Aetna signed by Meek as president of Meek, Inc., one a reply thereto—and a telegram to Meek, Inc., signed by Miller.

■ Rule 56(c) of the Rules of Civil Procedure provides that a motion for summary judgment shall be allowed "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine

---

1. Plaintiff in the appendix to her brief uses nine pages in setting forth extracts from Meek's deposition. On the other hand, defendant in its appendix sets forth the deposition in full, using thirty-four pages.

issue as to any material fact." It has been held, as the language of the statute indicates, that the allegations of the complaint are not controlling where controverted by depositions, affidavits or answers to interrogatories. Repsold v. New York Life Insurance Co. (7th Cir.), 216 F.2d 479, 483; Albert Dickinson Co. v. Mellos Peanut Co. of Illinois (7th Cir.), 179 F.2d 265, 267.

Plaintiff evidences great difficulty in evolving a theory in support of her contention that Aetna is legally responsible for the negligent acts committed by Meek, Inc. She alleges in her complaint and argues in her brief that the latter was the "controlled contractor" of Aetna, a term which so far as we are aware is unknown to the law. She also alleges and argues that Meek, Inc. was the agent of Aetna. In her brief she states, "Aetna ostensibly used Meek, Inc. as an independent contractor, while at the same time Aetna exercised control and interfered with the performance of Meek, Inc.'s contract with Purdue."

Irrespective of how the relationship between Aetna and Meek, Inc. is characterized, the crucial and decisive issue of fact is as to the control, if any, which Aetna exercised over Meek, Inc. in the performance of its contract with Purdue. The District Court in allowing defendant's motion for summary judgment concluded that as to this "material fact" there was no "genuine issue." With this conclusion we agree.

■ We limit our discussion of the facts to those which relate directly to the crucial issue of control by Aetna as to the manner and means by which Meek, Inc. was to perform its contract with Purdue. As already noted, Aetna in support of its motion presented the affidavit of its representative, Miller, who denied any and all means of control. More important is the deposition of Meek offered by plaintiff in opposition to the motion, which completely demolishes plaintiff's theory that Aetna exercised the control alleged. That such is the case is shown by the following questions and answers contained in the deposition:

"Q.67. Now, if I understand you correctly, you hired and fired your own personnel?

"A. Yes.

"Q.68. And even when Mr. Miller suggested that you should discharge Mr. Pruitt or removing him from the job, you kept him on anyway. Is that right?

"A. Yes.

"Q.69. In other words, it would be fair to say that you retained the right to select your own employees and to hire and fire them as you wished?

"A. This was, of course, the one thing that I had to retain to have any control what so ever.

"Q.70. And so you did retain that?

"A. I retained that as far as my supervision was concerned, yes.

"Q.71. And did you so far as your minor employees on the job were concerned, did you not?

"A. Right.

*    *    *    *    *    *

"Q.74. And so that so far as the manner and method of performing a contract, that was left up to you. Is that right?

"A. Yes, right.

"Q.74a. And to your supervision?

"A. Right.

*    *    *    *    *    *

"Q.76. I understand, but so far as actually making suggestions as to the manner and method of putting in the pipe or the work, he (Miller) made no suggestions in that regard?

"A. No.

"Q.77. Had no competency in that area to make such suggestions?

"A. That's right.

"Q.78. And those matters were left entirely in your hands?

"A. Right.

"Q.79. And I assume the same would be true as to the selection of tools? He made no effort to determine what tools should be or should not be on the job. Is that correct?

"A. That's right.

\*     \*     \*     \*     \*     \*

"Q.108. Did you have a right to fire anybody, discharge anyone that was working up there from the time Aetna took over?

"A. Yes.

"Q.109. Would you have to go through Aetna for anything, get any approval for that?

"A. No.

"Q.110. If you hired a man would you have to get Aetna's approval?

"A. No.

"Q.111. Did Aetna give you authority to hire and fire then, from the time they took over?

"A. Yes.

\*     \*     \*     \*     \*     \*

"Q.144. Well, tell us, what, if anything, Aetna suggested to you be done, to make it a more efficient operation after they took over?

"A. The only thing I know was, Mr. Miller, suggested that I spend more time at the job. Offhand, that is all that I know."

Meek further testified that Aetna had nothing to do with the defective hammer; that it was purchased by Meek, Inc., not Aetna, and that it was the responsibility of Meek, Inc. to repair defective equipment with money furnished by Aetna. The record is clear that Aetna at no time took over and agreed, as alleged in the complaint, to perform the obligation which Meek, Inc. had with Purdue. Subsequent to the agreement between Meek, Inc. and Aetna relative to the furnishing of money, Meek, Inc. at all times remained the independent contractor of Purdue and not of Aetna. The status of Aetna was not altered; it remained as it was before, liable on its bond to Purdue for performance by Meek, Inc.

Plaintiff relies upon fragmentary bits of Meek's deposition, the correspondence exchanged between the parties and the testimony as to Miller's activities, and seeks to draw certain inferences which she asserts create a factual issue as to Aetna's control. We think it doubtful that such inferences may be properly drawn but, if so, they are entirely dissipated by the direct and positive testimony to the contrary.

Plaintiff concludes her brief with the statement, "The power to control the purse strings is the most complete power of control that can be devised." As a general statement this may be correct, but it is beside the issue here. The mere fact that Aetna furnished the money gave it no control over the manner and means by which Meek, Inc. was to complete its contract with Purdue. Aetna rightly was interested in knowing that the money which it furnished was properly expended. For this purpose Miller made frequent visits to the work site. On occasions he interviewed some of the employees of Meek, Inc. to see that all employees being paid were on the job; on other occasions he interviewed officials of Purdue to see if Meek, Inc. was performing its contract to their satisfaction. All of such activities were consistent with Aetna's position as a money lender and its bond obligation to Purdue.

■ This being an Indiana case, we look to the decisions of its courts for guidance. The most pertinent perhaps is Marion Shoe Co. v. Eppley, 181 Ind. 219, 104 N.E. 65. There, Marion Shoe Company employed a construction firm to erect a building, but by reason of the latter's financial condition Marion directly paid employees working on the job and for material used. The construction firm employed its own men and gave the orders to them as to what they should do and how it should be done. The presi-

dent of Marion was about the building practically every day during its construction and conferred from time to time with persons doing the work, pointing out mistakes in the construction. A bricklayer employed by the construction firm was injured while at work and sued Marion on the theory that the method of payment and the frequent inspection of the work was sufficient to make Marion responsible for the defective condition of the scaffold. The Supreme Court of Indiana in denying recovery held that the fact that Marion had paid for materials and had handled the payroll did not destroy the basic relationship because the construction firm had retained control over the manner in which the work was performed.

In Zainey v. Rieman, 81 Ind.App. 74, 142 N.E. 397, a carpenter working on a building was injured by reason of a defective scaffold. The building was being constructed by an independent contractor who hired, supervised and controlled the men employed, but the owner furnished money for the payroll and for the purchase of materials used in the building. The Court held that the person responsible for the defective scaffold was the independent contractor, not the owner.

The case of Prest-O-Lite Company v. Skell, 182 Ind. 593, 106 N.E. 365, involved a construction contract. There, the owner provided an inspector, with authority to examine materials furnished and to condemn those which did not conform. The inspector had the right to arrest the progress of the work. The jury returned a verdict for the plaintiff. The Supreme Court reversed and held that such facts constituted no evidence to support control over the manner of doing the work and that the owner was not obligated to see that the contractor exercised due care in its performance.

Thus, each of these cases firmly supports the proposition that an employee of an independent contractor who has control over the manner in which a contract is to be performed cannot recover against the principal for personal injuries, even though the latter furnishes the money for labor and material and has the right to see that it is properly expended. We see no reason why the same rule should not be given effect in the instant case.

What we have said is sufficient to require an affirmance of the order appealed from, and we think it unnecessary to discuss the other issue relied upon by defendant.

The order is

Affirmed.