Gerald A. HALE, Plaintiff,

v.

BETHLEHEM STEEL CORPORATION,
Defendant.

No. 70 C 1967.

United States District Court,
N. D. Illinois, E. D.

Nov. 30, 1971.

Horwitz, Anesi, Ozmon & Associates, Chicago, Ill., for plaintiff.

Harlan L. Hackbert and George W. Gessler, Hackbert, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

DECKER, District Judge.

This is an action for damages arising out of an accident which occurred at a construction project in Burns Harbor, Indiana, when the plaintiff, Gerald A. Hale, fell from a platform upon which he was working and sustained serious injuries. Although a citizen of Indiana, plaintiff filed his complaint in the Circuit Court of Cook County, Illinois, against a number of defendants, one of whom was Bethlehem Steel Corporation,

which is neither incorporated nor maintains its principal place of business in either Illinois or Indiana. The suit was removed to this court, and I assumed jurisdiction based upon 28 U.S.C. §§ 1332 § 1441. A trial on the merits resulted in the dismissal as to all defendants other than Bethlehem and the finding of the following relevant facts.

In 1969 Bethlehem was engaged in the construction of an entire steel facility at Burns Harbor consisting of a number of buildings occupying an area of 25 to 30 acres. The accident occurred in one of these buildings called a "soaking pit", which was a large structure, approximately 1000 feet long and 150 to 170 feet wide.

This "soaking pit" was being constructed under a so-called "turnkey" contract between Bethlehem and Surface Combustion Company. This contract provided, in effect, that Surface would be the prime contractor for the construction of the "soaking pit" and that it would deliver it to Bethlehem in "turnkey" (working) order. Morrison Construction Company (hereinafter "Morrison"), the corporation which was the plaintiff's employer, was acting as the mechanical piping subcontractor under Surface.

Plaintiff was first employed as a pipe fitter on March 17, 1969, and on March 19, 1969, plaintiff and two other Morrison employees, Rogers and Dudy, were engaged in adjusting butterfly valves in the soaking pit area. During the morning of March 19, 1969, the three men were directed by Morrison's foreman, Tiege, to cut out and take down a section of a four inch vertical pipe in order to enable another Morrison crew to lower some additional pipe into the basement of the soaking pit building.

Lying next to the pipe which was to be cut was a "pick", a portable aluminum platform about 24 inches wide and 24 or 25 feet long, weighing about 90 to 100 pounds, and located approximately 25 feet above the floor of the soaking pit. One end of the "pick" was resting on a horizontal pipe, and the other end rested on the handrail of a catwalk or stairway. Although it was the customary practice to wire down picks of this type to the supporting structures, this had not been done.

Just prior to the accident, the plaintiff was directed by his foreman, Tiege, along with Rogers and Dudy, to use the "pick" in doing the pipe cutting. Rogers climbed from below onto the "pick" at about in the center. Plaintiff, carrying his cutting torch, followed Rogers and climbed onto the "pick" from the structural steel below. Plaintiff and Rogers sat down on the "pick" with their legs hanging over the north edge. As plaintiff lit his torch, Rogers moved to the east, or to his right. This shifting of his weight caused the "pick" to tilt to the north and caused plaintiff to fall to the basement of the soaking pit. Rogers grasped the handrail of the catwalk and saved himself from falling.

There is no dispute that the "pick" on which the accident occurred was owned by Bethlehem. There is an unresolved mystery as to how the "pick" arrived on the scene. One witness testified that it had been there for a week or two; another that it had been there two or three weeks prior to the accident. The plaintiff and another witness saw it for the first time that day.

During this period there were between 4,200 and 4,500 employees of various contractors and subcontractors engaged in construction. There was some vague evidence to the effect that the "pick" had been used at this location by some unidentified electricians. The superintendent of the electrical subcontractor, Fischbach & Moore, testified that they had done no work in this area within a period of five to six weeks prior to the accident.

Bethlehem had an engineering and construction department to oversee the complete Burns Harbor project. In March of 1969 the department consisted of a superintendent, Kennard Champness, and 35 employees, broken down into several groups, including a cost group and a field group. The field

group consisted of 15 to 18 field foremen, who were assigned to different buildings under construction. One of the field foremen was assigned to the "soaking pit", and his primary function was to see that the schedules were maintained and the job carried forward according to the plans and specifications.

It was the responsibility of each field foreman to call any contractor error or unsafe practice to the attention of the prime contractor's superintendent. Unless some immediate hazard of injury or accident was involved, the field foremen would not go to a contractor's foreman or general foreman. None of the field foremen gave any orders to contractors' or subcontractors' employees. In addition to this, Bethlehem held monthly meetings attended by representatives of the various contractors and subcontractors, which meetings were concerned with general safety practices.

Mr. Champness' department had two safety engineers for the entire construction area and construction work force. One or the other of the safety engineers attempted to cover the area each day, and if he saw an unsafe work practice, the safety engineer would contact the prime contractor's superintendent in the same manner as the field foremen.

There was no evidence that any Bethlehem employee used the "pick" at that location or of any work that had been performed by Bethlehem at that elevation in the three-week period before the accident or of any future work to be performed by Bethlehem at that location.

It is in this factual setting that plaintiff asserts that defendant is liable for his injuries. Plaintiff's first contention is that Bethlehem, being the owner of the property under construction and by virtue of its supervisory activities over this project, is a person who was in "charge of, or responsible for," the work in question within the purview of the Indiana Dangerous Occupations Act.[1]

So far as that Indiana statute is concerned, I am governed by the decisional law of Indiana, where the accident occurred. Ever since the adoption of the Indiana Dangerous Occupations Act in 1911, the Indiana courts have narrowly construed the language, "have charge of, or responsible for", to apply to the particular person or entity in charge of or responsible for the work at hand when the accident occurred. Prest-O-Lite Co. v. Skeel, 182 Ind. 593, 106 N.E. 365 (1914); Leet v. Block, 182 Ind. 271, 106 N.E. 373 (1914); Wyler v. Lilly Varnish Co., 252 N.E.2d 824 (Ind. App.1969); Zainey v. Rieman, 81 Ind. App. 74, 142 N.E. 397 (1924).

The viability of Leet v. Block, *supra,* is clearly recognized in a diversity case decided by our Circuit Court of Appeals in Bruemmer v. Clark Equipment Company, 341 F.2d 23 (1965). There, Chief Judge Hastings, speaking for the court, said:

"The Indiana Supreme Court in Leet v. Block, 182 Ind. 271 [106 N.E. 373] . . . a case brought under Section 20–304 of the Act, stated:

" 'Does the act of 1911 impose on the owner and contractor such duties of testing and inspecting as to deprive each of them of the independent contractor defense? We are of the opinion that the question must be answered in the negative. *The act evinces no legislative intent to impose a duty of testing and inspecting appliances, except on the particular owner, contractor, or subcontractor who has "charge of" or is "responsible for" the*

---

1. The relevant portion of the Indiana Dangerous Occupations Act (5 Burns Ind.Stat.Ann. § 20–301 et seq.) IC 1971, 22–11–4–1 et seq. provides as follows:

"[G]enerally it shall be the duty of all owners, managers, operators, contractors, subcontractors, and all other persons *having charge of, or responsible for,* any work, . . . of whatsoever nature involving risk or danger to employees, or to the public, to use every device, care and precaution which it is practicable and possible to use for the protection and safety of life, limb and health, . . . ." (Acts 1911, ch. 236, § 4, p. 597.) (Emphasis supplied.)

*work, etc., in question. . . . It was the purpose of the enactment to fix a higher standard of care on the person having the particular work in charge, whether such person be owner, contractor, subcontractor, or other person, but the language of the statute, considered as a whole precludes the theory of any intent to eliminate the doctrine of independent contractor.'* (Emphasis added.) Id. at 274, 275, 106 N.E. at 374.

. . . . . .

"It seems clear to us from the previously quoted language in Leet, that the court was interpreting the Act of 1911 in its entirety, not merely Section 20–304, and intended its holding to so apply. Further, we conclude that the broad and inclusive language of Section 20–304, quoted above, indicates a legislative intent that the entire act was to apply only to persons 'having charge of, or responsible for' the specified dangerous occupations." 341 F.2d at 26–27.

In Wyler v. Lilly Varnish Co., supra, the court rejected the argument which the plaintiff makes in this case that the owner, the general contractor and the subcontractors could all be "in charge of, or responsible for the work", saying:

"The principle (sic) thrust seems to have been directed towards an attempt to establish statutory and contractual duties on the part of all appellees to barricade, post signs, etc., merely because each was an owner, contractor, or sub-contractor and without regard to what work related connection, if any, each had with the air-well. Such a theory of liability is not supported by either the contract or by the statute. Leet v. Block, 182 Ind. 271 [106 N.E. 373] . . . (1914), and Bruemmer v. Clark Equipment Company, 341 F.2d 23 (7th Circ., 1965) both hold that the statute 'evinces no legislative intent to impose a duty . . . except on the particular owner, contractor, or sub-contractor who has "charge of" or is "responsible for"

the work, etc., in question'." 252 N.E. 2d at 833.

Turning to the undisputed facts adduced in this case, it is clear, to the exclusion of any other view, that Morrison, plaintiff's employer, was in charge of the work being performed by plaintiff, and vis-a-vis, Bethlehem was an independent contractor as that term is defined by Indiana law. Prest-O-Lite Co. v. Skeel, *supra*, at 106 N.E. 367.

▮ Plaintiff received all of his directions from his immediate employer, Morrison. Bethlehem exercised no control over the plaintiff or the manner in which he was to perform his work. It is clear from the Indiana cases that the general overall contract-keeping activities of Bethlehem did not place it "in charge of" the work being done by plaintiff. Bedford Stone, etc. Co. v. Hennigar, 187 Ind. 716, 121 N.E. 277 (1918); Prest-O-Lite Co. v. Skeel, *supra*; Forcum-James, Inc. v. Johnson, 115 Ind.App. 655, 59 N.E.2d 730 (1945). See also, Dismore v. Aetna Casualty Co., 338 F.2d 568 (7th Cir. 1964).

I conclude that plaintiff is not entitled to recover against Bethlehem under the provisions of the Indiana Dangerous Occupations Act.

Plaintiff next contends that Bethlehem is liable to him for damages on a theory based upon the common law of negligence. Basically, plaintiff asserts that Bethlehem was negligent in furnishing him with a defective scaffold and in failing to furnish a safe and reasonable place to work and to warn plaintiff of the dangers which were or ought to have been obvious to Bethlehem.

▮▮ Under Indiana law, the plaintiff in a negligence action has a duty to exercise reasonable care for his own safety. This includes the ordinary use of one's faculties and senses to discover and avoid conditions of danger. Hunsberger v. Wyman, 247 Ind. 369, 216 N. E.2d 345 (1966). Indiana also enforces

the rule that if the plaintiff's negligent conduct contributes to his injury, to any degree, his claim is barred, even if the other party may have been negligent to some degree. Tyler v. Nolen, 248 N.E. 2d 186 (Ind.App.1969); Kilmer v. Galbreth, 139 Ind.App. 252, 218 N.E.2d 361 (1966).

Insofar as Bethlehem is concerned, there was no evidence that the "pick" itself was defective. The problem arose because some unknown user had failed to wire it down to the supporting structures. The parties agree that this was an unsafe and dangerous practice. It was customary procedure in the trade to wire down picks of this type. One of plaintiff's co-workers testified that if Morrison had put the "pick" up, it would have wired it.

The evidence is clear that neither the plaintiff nor his foreman, who ordered the pipe cutting and placed the plaintiff in the precarious position 25 feet from the floor of the soaking pit, examined either end of the "pick" to see if it was wired down. Even a casual examination would have revealed the fact that the "pick" had not been wired down and was unsafe for use in this condition. Only a form of myopia induced by over-zealous advocacy could obscure the conclusion that if defendant's representatives on their general inspection should have noticed that the "pick" was unsecured, then the same requirement clearly applied to the plaintiff when he climbed onto the "pick" without even looking to see if it was fastened.

Under these circumstances, the conclusion is inescapable that the plaintiff's failure to exercise any degree of care for his own safety was negligence which proximately contributed to his fall and resulting injuries. His contributory negligence stands as a bar to his recovery.

Accordingly, I find the issues in favor of the defendant and against the plaintiff.