**Richard Allen NAGLER and Donna Diane Nagler, Plaintiffs-Appellees,**

v.

**UNITED STATES STEEL CORPORATION, Defendant-Appellant.**

**No. 72-1601.**

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1973.

Decided July 9, 1973.

Rehearing Denied July 30, 1973.

2. Payne v. Baltimore & Ohio R. R. Co., 309 F.2d 546 (6th Cir. 1962); McWeeney v. New York, N. H. & H. Ry. Co., 282 F.2d 34 (2d Cir. 1960).

G. Edward McHie, Hammond, Ind., George W. Gessler, Harlan L. Hackbert, Chicage, Ill., for defendant-appellant.

Joel C. Levy, Hammond, Ind., Allen L. Ginsberg, Chicago, Ill., for plaintiffs-appellees.

Before CLARK, Associate Justice*, CASTLE, Senior Circuit Judge, and STEVENS, Circuit Judge.

CASTLE, Senior Circuit Judge.

A jury verdict awarded plaintiff Richard Allen Nagler $1,030,000.00 for injuries sustained while he was working in defendant's steel mill. His wife was awarded $150,000.00 for loss of consortium. The United States Steel Corporation prosecutes this appeal contesting its liability for plaintiffs' damages.

---

* The Honorable Tom C. Clark, Associate Justice of the Supreme Court of the United States, retired, is sitting by designation.

As part of its operations at Gary, Indiana, United States Steel operates a 46″ Slab Mill, where ingots of assorted sizes are heated in furnaces called soaking pits to approximately 2350° before being rolled out into variously-shaped slabs. The mill contains about fifty-six soaking pits arranged in batteries of four, every battery having its own heat source. Each individual pit is twenty-seven feet long, nine and a half feet wide, and fifteen feet high. Each is topped with a movable cover that slides on rails to allow overhead cranes to lower ingots in for heating.

A typical soaking pit at the mill consists of three steel walls lined with a 30-inch thickness of brick refractory material. The fourth wall, which serves as a common wall between two soaking pits, is a 40-inch barrier constructed of brick. The top 1½ feet of each wall are capped with coping or curbs, which consist of plastic-like bricks that are pounded down on the refractory material and are fused together by the heat of the furnace.

On occasions it is necessary to repair and replace the refractory material and/or coping in each soaking pit. Several causes of deterioration necessitate repairs. The most prominent is the accumulation of slag, which coats the pit and gradually eats away at the refractory walls, making them sag. At times crane operators accidentally drop ingots while they are lowering them into or removing them from a pit, causing the floors of the pit to become beveled or the walls to be damaged. Fins which protrude from ingots formed in imperfect molds may also strike the walls or the coping on occasion.

In order to determine when a given soaking pit must be repaired or rebuilt, certain U.S. Steel officials make visual inspections of the pits while they are in operation and when the walls are consequently red from heat. If this inspection, conducted from a catwalk several feet above and beyond the pit, discovers damage or wear, the pit is shut down and another inspection is made when the walls cool somewhat to determine exactly what repairs or replacements are necessary. This later inspection is apparently conducted from walkways level with the top of the pit and running perpendicular to the twenty-seven-foot long walls of the pit. Three kinds of repairs can be ordered after inspection—the pit can be "gunned" or sprayed with a substance that forstalls weakening, masonry repairs can be made, or the walls or portions of them can be torn down and completely rebuilt.

When the decision has been made to rebuild portions of a pit lining, U.S. Steel has usually called upon Furnace Services, Inc., an independant contractor, to tear down the coping and/or refractory brick in preparation for reconstruction by U.S. Steel masons. To accomplish its tear-down work, Furnace Services makes use of its own "pit machine," a telescopic-armed device which straddles and is locked onto the rails on which the pit cover normally slides. The arm of the machine reaches into the pit and, in a jack hammer-like manner, its point digs into the refractory material, causing it to fall when the point is withdrawn. The operator of the pit machine usually stands or sits above the pit and operates the device with a control box of several buttons.

Before Furnace Services knocks refractory material from a pit or wall, it removes the dumping bells and plates from the floor of the soaking pit to open up two holes approximately three feet by nine and one-half feet. Debris knocked from a wall falls or is pushed by a paddle attached to the pit machine through these holes into the basement below the pit, where it is removed by a Furnace Services employee with a payloader tractor.

On August 27, 1969, U.S. Steel engaged Furnace Services to work on pit 11D in the 46″ Slab Mill. A job order and diagram given to the pit machine operator specified that the Furnace Services crew was to remove the refractory material and coping on three walls and the floor of the pit, but that the twenty-seven-foot long south wall serv-

ing as the common wall between pits 11D and 11C was to be left standing. Demolition was started at 8:00 in the morning by a three-man work crew consisting of a pit machine operator, a laborer, and plaintiff Richard A. Nagler, who operated the payloader under the pit. At 3:30 a new pit machine operator took over the tear-down task, but since Furnace Services did not have another payloader operator available, Nagler continued the basement cleanup task. Sometime after 9:00 p. m., when the pit machine operator had ceased knocking bricks from the walls and just as an overhead crane was passing above the pit, Nagler drove under one of the 3 x 9½ foot dumping holes to pick up another load of rubble. At this point a large chunk of coping fell from the south division wall, passed through the dumping hole, and struck Nagler. He sustained a compression fracture to his first lumbar vertebra and had his spinal cord severed. He is now paralyzed from the waist down.

The testimony and evidence produced at trial will be recounted where relevant to the consideration of the various issues raised by defendant United States Steel on this appeal: 1) whether the district court erred in failing to direct a verdict in its favor because the evidence failed as a matter of law to prove that it was negligent and because an independent contractor had control over the area where plaintiff was performing his work, and 2) whether the district court erred in refusing defendant's tendered instructions on assumption of risk and the effect of federal income taxes upon damages awarded.

## I. *Failure to Direct Verdict in Favor of Defendant.*

U.S. Steel argues that the trial court should have directed a verdict in its favor because the evidence failed to establish that it was guilty of negligence that proximately caused plaintiff's injuries. Its two-pronged theory on appeal contends that it was not shown to be negligent in its inspection of the soaking pit

before turning control over the pit to Furnace Services, and that it could not be liable for any accidents occurring during the time that Furnace Services was working on the pit, since that independent contractor had exclusive control over the pit.

Two rules of legal liability for injury are involved in this case. The first, understandably stressed by the plaintiff, holds that U.S. Steel owed Richard Nagler the duty to provide a safe place to work, since Nagler, as an employee of an independent contractor, was a business invitee of U.S. Steel. Broadhurst v. Davis, 146 Ind.App. 329, 330, 255 N.E.2d 544, 545 (1970). Such a duty obligated U.S. Steel to exercise reasonable care to inspect the soaking pit to discover defects or dangerous conditions in it and to warn Furnace Services and its employees of these dangers. Verplank v. Commercial Bank, 145 Ind.App. 324, 334, 251 N.E.2d 52, 58 (1969); Broadhurst v. Davis, *supra*, 146 Ind. App. at 330–331, 255 N.E.2d at 545–546, Hoosier Cardinal Corp. v. Brizius, 136 Ind.App. 363, 376–77, 199 N.E.2d 481, 487–488 (1964). On the other hand, the defendant stresses the rule that an owner of property is not generally liable for injuries to employees of an independent contractor when the owner exercises no direction over the work of the employees. Marion Shoe Co. v. Eppley, 181 Ind. 219, 222–223, 104 N.E. 65, 66 (1914); Bauer v. Plumbers' Supply Corp., 137 Ind.App. 106, 110–111, 205 N.E.2d 567, 569 (1965); see also Wolfe v. Bethlehem Steel, 460 F.2d 675, 677 (7th Cir. 1972); Dismore v. Aetna Casualty, 338 F.2d 568, 573 (7th Cir. 1964). These two rules, of course, are compatible: An owner is not liable for negligent injuries to an employee of an independent contractor unless he actively participated in the negligent act causing the injury or unless he failed to warn of hidden dangers on the premises of which he had or ought to have had knowledge and of which the employee had not. Titan Steel Corporation v. Walton, 365 F. 2d 542, 546 (10th Cir. 1966). The issue,

then, is whether there was sufficient evidence for a jury to find U.S. Steel liable under this theory.

In determining whether to direct a verdict, a court must consider whether there is any evidence from which a reasonable inference can be drawn that tends to support one or more allegations of negligence charged in a complaint. If so, there is a question for the jury and the direction of a verdict is improper. Adkins v. Elvard, Ind.App., 294 N. E.2d 160, 162 (1973); Wallace v. Doan, Ind.App., 292 N.E.2d 820, 826 (1973); United States Steel v. Warner, 378 F.2d 995, 998 (10th Cir. 1967). Naturally the mere existence of a defect is insufficient to establish liability of the owner of a business. But we believe that there was sufficient evidence introduced at trial to support a jury's reasonable conclusion that the failure of the defendant to exercise due care proximately caused plaintiffs' injuries.

It is evident that one can only rely on inferences from the evidence as to what caused the coping to fall from the south wall of pit 11D on the night of August 27, 1969. The plaintiffs tried their lawsuit under the theory that the coping was loose before the pit was turned over to Furnace Services on August 27, 1969, and that it was finally shaken loose by the vibrations of the crane passing overhead just prior to the accident. Under this theory, defendant was negligent and violated its duty to provide a safe place to work by inadequately inspecting the division wall, failing to discover that the coping was loose, and neglecting to warn Furnace Services' employees of the defective condition.

■ There was ample evidence presented at the trial to support the theory that the coping on the south wall was weakened and in danger of being shaken loose when U.S. Steel employees inspected it, and that their inspection was not reasonably conducted to discover this condition. Evidence at trial established that U.S. Steel had ample warning that the coping on the south wall could become damaged in many ways. Supervisors recounted that coping could be damaged when being struck by fins protruding from ingots or being brushed by ingots improperly placed into or removed from the pit. On occasions ingots were also dropped from cranes, causing either the soaking pits or the surrounding area to reverberate from the resulting thud. Vibrations caused by the overhead cranes, ingot buggies, and rolling tables contributed to the general deterioration of the coping caused by the immense heat in the soaking pits. More particularly, U.S. Steel repair records showed that the coping on the south division wall had been installed two years previous to the accident, at the time that the other walls—which Furnace Services was to demolish—were also installed. These records suggested that the coping on the south wall was a maintenance problem for U.S. Steel, for this coping had been sprayed to forestall weakening on two occasions when no spraying or repairs had been performed on other walls or coping in pit 11D.

There was also evidence from which the jury could conclude that U.S. Steel did not exercise due care in its inspection of the pit to determine which walls were weak and in need of repair. Although no U.S. Steel supervisor could remember the inspection made in pit 11D before the determination of the repairs needed, the common practice at the mill apparently was to conduct two visual inspections of a pit—one from a catwalk eight feet above the pit, and another from a walkway on the east side of the pit and level with its top. From their vantage point on the east walkway, inspectors would have been at least 13½ feet from the middle of the south division wall running perpendicular to the walk, and 27 feet from its farthest end. Defendant's supervisors also admitted that they depended exclusively upon their own visual estimation of the strength of the walls. No scrutiny of repair records was conducted to determine how long a wall had gone without being repaired or replaced. No consul-

tation was had with plant personnel responsible for employee safety. No tapping of the coping was done to determine its strength. Masonry department supervisors were not regularly consulted. Though witnesses testified that it was sometimes necessary to scrape the walls to discover cracks, no one recalled performing such a close inspection to pit 11D prior to the accident. In fact, one supervisor's admission that he had no idea how hot the coping might be at the time of inspection supports the inference that no contact with the coping ever occurred during an inspection. We conclude that there was sufficient evidence to support the jurors' conclusion that something more than a mere visual inspection was required by defendant's duty to exercise due care for the safety of plaintiff Richard Nagler.

Finally, there was evidence to support a jury's finding that the defendant failed to give Furnace Services' employees proper warning of the general danger of coping falling from pit walls. Supervisors admitted that on occasion coping would fall without being struck by any object, and that they would direct their employees to knock precariously-hanging pieces of coping off the wall if they noticed the pieces were about to fall. Yet no one gave notice of this danger to Furnace Services' employees.

We conclude that the evidence supported reasonable inferences that the coping was loose before the pit was turned over to Furnace Services and that U.S. Steel could have discovered this fact by exercising reasonable care in conducting its inspection. The plaintiffs introduced sufficient evidence to establish that the visual inspections of the pits were insufficient and to show that U.S. Steel failed to fulfill its duty to warn Richard Nagler or his supervisors of the general danger of falling coping.

█ █ Defendant has strenuously argued that it is immune from liability because it had turned over exclusive control of the soaking pit to Furnace Services thirteen hours before the accident, and that during this time it was the duty of Furnace Services to maintain surveillance of the pit walls. As noted above, this argument on appeal cannot support the contention that Furnace Services' employees proximately caused the accident, for the jury—on sufficient evidence—concluded otherwise. Apparently defendant is seeking to establish that Furnace Services' exclusive control over the soaking pit relieved U.S. Steel as a matter of law from any liability arising out of its failure to adequately inspect the coping or to warn Furnace Services' employees of the danger of it falling.

Initially, we cannot accept the defendant's characterization of Furnace Services as having exclusive control of the pit. The job order written up by U.S. Steel specifically instructed Furnace Services to dismantle three walls, but not the south wall from which the coping fell. Standing instructions to Furnace Services required approval of high supervisory personnel before any work not called for in the job order could be undertaken. The evidence showed that Furnace Services' pit machine operators would keep on the lookout for dangerous conditions, and that they would either knock down portions of walls posing a danger to payloader drivers or warn them of the hazard. The pit machine operator working at the time of the accident testified that he had kept an eye on the south wall while he was working, and that he had noticed a one-inch crack in the coping, but did not tell his supervisor about it.[1] Such evidence, although establishing that Furnace Services' employees paid some heed to their own safety, shows only that as business invitees they were on the lookout for obvious dangers which U.S. Steel was under no duty to warn them about. W. Prosser, Law of Torts 394 (4th Ed. 1971). Nothing in the record indicates

---

1. The evidence does not specify whether the crack was one inch long or one inch wide.

that Furnace Services was told that it had the duty to conduct an adequate, detailed examination for latent defects on the south wall [2] that it was not ordered to work on. [3]

We conclude, therefore, that the jury had sufficient evidence before it upon which it could have reasonably concluded that Richard A. Nagler's injuries were due to the condition of the premises which he entered as a business invitee and that he was injured by defendant's negligence in either failing to exercise due care in inspecting the premises or warning him of the danger of falling coping.

## II. *Failure to Deliver Instructions Tendered by Defendant.*

■ U.S. Steel submits that the district court erred in failing to deliver two instructions it requested, one dealing with the assumption of risk, the other with the impact of income taxes upon the amount of damages awarded. We find no error in the refusal of these instructions.

Defendant's instruction on the assumption of risk would have informed the jury that any vibrations caused by certain machinery operating in the slab mill were accepted by plaintiff Richard Nagler as a condition of his work, and that he assumed any risk resulting from such conditions. Defendant argues that the refusal of this instruction, coupled with the admission of testimony about the vibrations caused by cranes, ingot buggies, roller tables, and other equipment, was prejudicial error.

It is true that plaintiff did know about the vibrations caused by various machines in the mill. But the record is devoid of any evidence that he knew of the risks of these vibrations—specifically, that they could cause coping to fall upon him from the south wall while he was driving under a dumping hole. In order to justify delivery of an instruction on the assumption of risk similar to the one tendered by the defendant in this case, Indiana law requires that there be some evidence of knowledge of these risks. National Motor Vehicle Co. v. Kellum, 184 Ind. 457, 468, 109 N.E. 196, 199 (1915); Booher v. Alhom, Inc., Ind.App., 295 N.E.2d 841, 848 (1973). In the absence of such evidence, refusal of the instruction was proper.

■ U.S. Steel also requested the delivery of the instruction that "any award made to the plaintiff . . . is not income to the plaintiff within the meaning of federal income tax law" and that the jury should in no event "either add to or subtract from that award on account of federal income taxes." Such an instruction recently received the blessing of the third circuit in Domeracki v. Humble Oil & Refining Co., 443 F.2d 1245 (3rd Cir. 1971), where the court directed that it be given henceforth in that circuit upon request. We

---

2. Nor do we interpret a clause in the contract between Furnace Services and U. S. Steel making Furnace Services responsible for the safety of its own employees as requiring such inspection.

3. It is also quite doubtful whether a business proprietor can avoid the consequences of the breach of his duty to inspect his premises by asserting that he delegated this duty to an independent contractor and that the independent contractor had failed in its inspection. The defendant has cited us no Indiana authority bearing on this issue or contradicting Professor Prosser's viewpoint that "[i]t is generally agreed that the obligation as to the condition of the premises is of such importance that it cannot be delegated." W. Prosser, Law of Torts 395 (4th Ed. 1971). The rule imposing the duty upon a business inviter to inspect his premises and to warn of defects arises from a public policy in favor of preventing accidents by placing the onus of safety upon the occupier of a premises who has the most information as to the operations creating dangerous conditions on his premises, the best means of inspection, and the actual existence of the dangers. Hoosier Cardinal Corp. v. Brizius, supra. Allowing a business proprietor to escape liability by delegating this duty to one with less knowledge and less experience would appear to be contrary to such a public policy.

note only that Indiana law is apparently unfavorable to this instruction, Highshew v. Kushto, 235 Ind. 505, 507–508, 134 N.E.2d 555, 556, 135 N.E.2d 251 (1956) and that whatever its desirability, it is not within our province to hold that its refusal was reversible error.

The judgment of the district court is affirmed.

Affirmed.